IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


IN RE: AMERICAN INVESTORS      :
LIFE INSURANCE CO. ANNUITY     :      MDL DOCKET NO. 1712
MARKETING AND SALES PRACTICES  :
LITIGATION                     :


MEMORANDUM

McLaughlin, J.                                December 18, 2009


      The plaintiffs have moved for certification of a class, final approval of a settlement, and an award of attorneys' fees, costs and incentive payments in this case involving the sale of long-term deferred annuities products.  The defendants do not oppose the motion.  The Court held a hearing on November 6, 2009, and now grants the plaintiffs' motion and enters final judgment and an order of dismissal.


I.   Background

    A.   Overview

      This action is a multi-district litigation proceeding that involves six consolidated putative class action lawsuits, the oldest of which has been pending before this Court for five years.[1]  On October 26, 2005, the Judicial Panel on Multidistrict

---

[1] The putative class action lawsuits consolidated into this action are as follows: (1) <u>Beryl Price, Charlotte Price, and Joseph Healy v. AmerUs Group Co., AmerUs Annuity Group Co., American Investors Life Insurance Co., Inc., Barry O. Bohmueller, Brian J. Newmark, Estate Planning Advisors Corp., BEN Consulting Co., Funding & Financial Services, Victoria Larson, and Kenneth</u>

Litigation transferred the related actions to this Court.  The actions were consolidated for pretrial purposes on November 11, 2005.

The Court granted the defendants' motion to dismiss on June 2, 2006, but it allowed the plaintiffs to amend their complaint.  The plaintiffs filed a consolidated amended class action complaint on August 9, 2006, naming only the AmerUs entities as defendants.[2]  The defendants filed a new motion to dismiss.

The plaintiffs then filed a second amended consolidated

_____

Krygowski, No. 2:04-cv-3329 (E.D. Pa. July 15, 2004); (2) George Miller v. AmerUs Group Co., AmerUs Annuity Group Co., American Investors Life Ins. Co., National Western Life Insurance Co., American Equity Investment Life Insurance Co., Brian J. Newmark, Estate Planning Advisors Corp., BEN Consulting Co., Funding & Financial Services, Patriot Group, Addison Group, Brett Weinstein, Victoria Larson, and Stephen Strope, No. 2:04-cv-3799 (E.D. Pa. Aug. 11, 2004); (3) Richard Stein, Dena Stein, and Mary Lynch v. AmerUs Group Co., AmerUs Annuity Group Co., American Investors Life Insurance Co., Inc., Creative Marketing International Corp., Insurance Agency Marketing Services, Inc., and American Investors Sales Group, Inc., No. 2:05-cv-2391 (E.D. Pa. May 19, 2005); (4) Dorothy Eddy v. AmerUs Life Insurance Co., No. 6:05-cv-1006-JA-JGG (M.D. Fla. July 7, 2005); (5) Evelyn Edwards v. AmerUs Group Co., AmerUs Annuity Group Co., American Investors Life Insurance Co., Inc., and Senior Benefit Services of Kansas, Inc., 8:05-cv-1590-T27-TBM (M.D. Fla. Aug. 26, 2005); and (6) Jean Ryles v. AmerUs Life Insurance Co., American Investors Life Insurance Co., Inc., AmerUs Annuity Group Co., and AmerUs Group Co., No. 2:05-cv-6340 (E.D. Pa. Dec. 8, 2005).

[2] The defendants are: AmerUs Group Company (now known as Aviva USA Corporation), AmerUs Annuity Group Company, American Investors Life Insurance Company, AmerUs Life Insurance Company (now known as Aviva Life and Annuity Company), Creative Marketing International Corporation, and Insurance Agency Marketing Services, Inc.

class action complaint on March 1, 2007. The defendants supplemented their motion to dismiss in light of the plaintiffs' second amended complaint. On August 29, 2007, the Court granted in part and denied in part the defendants' motion to dismiss.

The parties then began their discovery, which lasted eight months. They produced over 200,000 pages of documents, including the defendants' training and sales materials used by agents who sold the annuities at issue to the plaintiffs. The plaintiffs deposed 9 of the defendants' corporate designees and employees, and the defendants deposed 12 individuals, including the named plaintiffs. The plaintiffs also exchanged expert reports of three experts. Pls.' Unopposed M. for Final Approval of Settlement, Class Certification, and Award of Attorneys' Fees and Costs and Incentive Payments ("Pls.' M.") 5-6; <u>See</u> Defs.' M for Summ. J. Exs. 1-89; Pls.' Opp. to Summ. J. Exs. 1-35.

In April 2008, the defendants moved for summary judgment. The plaintiffs then moved for class certification and then opposed the defendants' summary judgment motion.

On July 16, 2009, the plaintiffs filed their unopposed motion for preliminary approval of the settlement, certification of the settlement class, and order directing issuance of notice to the class. They attached to their motion a third amended consolidated class action complaint ("complaint"). They also attached the parties' stipulation of settlement ("settlement" or

3

"settlement stipulation") and proposed form of class notice ("notice").  The Court issued an Order on July 28, 2009, preliminarily approving the settlement and the notice. ("preliminary approval order").

On October 30, 2009, the plaintiffs submitted their unopposed motion for final approval of the settlement, class certification, and award of attorneys' fees and costs and incentive payments ("motion for final approval of settlement"). They attached eleven declarations and several exhibits to their motion.  The defendants submitted a declaration from Scott J. Dunn, a Business Systems Analyst from Aviva USA Corporation, attesting to the systems used to determine the composition of the class for notice dissemination.  The defendants also submitted a declaration and exhibits from Jason H. Gould, counsel for the defendants.  The declaration attested to the notice sent to federal and state officials regarding the settlement stipulation, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA").

In their complaint, the plaintiffs claim that the defendants perpetrated a scheme to sell investments to the class through misrepresentations and omissions about the characteristics of the investments.  They allege that the defendants targeted and induced the class to buy complex, long-term deferred annuities that lack liquidity.  The lengthy

4

surrender periods of the annuities prevent the class members from obtaining full access to the principal or interest earned on the annuities without incurring a significant penalty.  Many of the annuities' surrender periods exceed the actuarial life expectancy of the class members themselves.  Further, upon the investors death, beneficiaries suffer a loss on the lump sum transfer.

The plaintiffs allege that the defendants perpetrated their scheme with the help of independent sales agents and attorneys by: targeting senior citizens and other vulnerable purchasers, training sales group members to use deceptive practices and materials when selling the annuities, intentionally failing to train sales group members to make suitability determinations, failing to develop a process for making suitability determinations, and offering high commissions to sales group members who sold the annuities products.

In the complaint, the plaintiffs assert a violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), conspiracy to violate RICO, and several related state law claims.

B.    Settlement Negotiations

After the parties conducted months of discovery, culminating in the plaintiffs' motion for class certification and the defendants' motion for summary judgment, the parties began settlement negotiations.  Hr'g Tr. 13:20-23, Nov. 6, 2009.

To aid in their negotiations, the parties retained Professor Eric D. Green, a mediator for many complex, multi-party class action cases, who has authored books on dispute resolution and worked for thirty years as a professor at Boston University Law School. The mediation took almost one year and included approximately ten face-to-face meetings with Professor Green, numerous telephone calls and conference calls, and dozens of negotiating sessions in person and via teleconference. The parties also met frequently without Professor Green to move along their discussions. According to Professor Green: "The settlement discussions were protracted, highly contested, but principled, and entirely at arm's-length." The parties reserved discussions concerning an award of attorneys' fees and expenses until they agreed upon the material components of the settlement. Declaration of Professor Eric D. Green ("Green Decl."), attached to Pls.' M.

    C.    The Settlement Stipulation

The parties filed their settlement stipulation on July 16, 2009. The settlement stipulation defines the class as:

> All persons and entities that purchased
> Company Annuities issued during the Class
> Period and all persons and entities to which
> an ownership interest in such Company
> Annuities was subsequently assigned or
> transferred, or that otherwise held any
> interest as an Owner in such Company

Annuities, during the Class Period . . . .[3]
Settlement II.A.18.  The class period is from January 1, 1998, to
July 28, 2009.  It includes approximately 387,000 persons and
entities that purchased and/or owned approximately 474,000 of the
defendants' annuities.  Settlement II.A.22; Pls.' M. 5.

### 1.  Forms of Relief

The parties structured two forms of relief for the
class: general policy relief and claim process relief.  General
policy relief includes two versions: basic and enhanced.  Under
both basic and enhanced general policy relief, current owners of
eligible annuity policies that are in deferral or in
annuitization may elect to receive the entire amount of their
current account value, plus a specified bonus.  They will receive
this payout over a period of between two and seven years,
depending on the length of time they have already held the
annuity.  Owners of eligible policies that are categorized as
fully annuitized will receive a lump sum payment.  Class members

---

[3] Excluded from the class are officers, directors, or
employees of any defendant; the affiliates, legal
representatives, attorneys, successors, or assigns of any
defendant; any judge, justice, or judicial official presiding
over the action and the staff and immediate family of any such
judge, justice, or judicial official; the claim scorer and the
arbitrator and members of their respective immediate families;
and all persons and entities included in, and who did not exclude
themselves from, the settlement class in the action styled
"Cheves, et al. v. American Investors Life Insurance Company,
Inc., et al.," Case No. 031024, which action was previously
pending in the Superior Court of the State of California.

who elect this relief are not subject to surrender charges. Settlement IV.

Both basic and enhanced general policy relief also include for each policy in deferral a benefit equivalent to a 50% reduction in the amount of surrender charges, if any, that would otherwise apply under the policy on a death benefit due in the event of the death of the owner or the annuitant. Settlement IV.E.

Under basic general policy relief, the bonus for each policy depends on whether the policy qualifies as a "65-and-Over Contract." A 65-and-Over Contract is a contract as to which each original owner of the contract (or if no such original owner was a natural person, the annuitant) was 65 years of age or older when the contract was issued. The bonus for a 65-and-Over Contract equals 0.40% of the policy's accumulation value, and the bonus for all other contracts equals 0.15% of the policy's accumulation value. Settlement IV.B-IV.C.

Owners of 65-and-Over Contract policies that are in deferral, in annuitization, or fully annuitized may elect enhanced general policy relief by submitting an election form. This relief allows the owner to receive a benefit ranging from 0.40% to 2.0%, depending on: (1) whether and the extent to which the original owner's remaining life expectancy exceeds the policy's surrender charge period, and (2) how large a fraction of

the original owner's liquid net worth was used to purchase the policy.  Settlement IV.C.

As an alternative to basic and enhanced general policy relief, owners of eligible policies may elect claim process relief and participate in a claim review process.  Under this process, class members submit a claim form and proof of alleged misconduct by the defendants or salespersons involved in the sale.  A claim scorer reviews the claim form and materials.  The class members who elect this relief are not subject to cross-examination by the defendants.  Depending on the status of the policy and the score assigned to the corresponding claim, class members receive payments based on a percentage of surrender charges, if any, previously incurred by the policy owners, and a bonus ranging from 0% to 2.25%.  Settlement V.

The settlement also includes non-economic relief in the form of undertakings by the defendants related to the marketing and sale of annuities and other insurance products offered by defendants American Investors Life Insurance Company or AmerUs Life Insurance Company (now known as Aviva Life and Annuity Company).  The defendants agree to disclose, when applicable, that events organized by the defendants involve sales presentations.  They also agree to not misrepresent their status or the status of their agents as being investment advisors or estate planning experts.  Further, the defendants will maintain

guidelines and procedures for evaluating the suitability of annuities sold based upon information provided by the purchaser. They will also provide information to the purchasers regarding the characteristics of the annuities, and they will inform and direct their agents of these undertakings.  Settlement III.M.

### 2.  The Release

The settlement includes a release and waiver ("release") in exchange for the class members' relief.  The class members release the defendants from all causes of action, claims, allegations of liability, damages, restitution, equitable, legal and administrative relief, interest, demands or rights that were or could have been asserted in this action.  They also release "other defendants," defined as those persons and entities that are named as defendants in the complaints filed in the putative class actions, but that are not named as defendants in the complaint.  Additionally released are the officers, directors, employees, representatives, attorneys, and agents of the defendants and other defendants.  Settlement X.

The plaintiffs further agree that they will not institute, maintain, assert, join, or participate in any action or proceeding against those released that are based on or related to the facts alleged in the complaints filed in this action.

3.    Attorneys' Fees and Expenses and Incentive
      Payments

The settlement includes an agreement that the defendants will not oppose the plaintiffs' motion for an award of $17,699,840.50 for attorneys' fees and $550,159.50 for out-of-pocket expenses, totaling an award of $18,250,000.  According to the plaintiffs' expert, Dr. William Reichenstein, who holds an endowed chair in investment management at Baylor University and who has studied annuities for 20 years, the fee award amounts to approximately 3% to 9% of the settlement valuation.  The plaintiffs cross-checked their award using the loadstar method and found it equates to a 2.3 multiplier of the class counsel's loadstar amount.  Settlement XI.A; Pls.' M. 60-63.

The settlement also requires the defendants to pay the uncapped costs of settlement administration, estimated to be $1 million at the time of the plaintiffs' motion for final approval of settlement.[4]  Settlement XI.C; Pls.' M. 60.

Lastly, the settlement includes an incentive award to the named plaintiffs in the aggregate amount of $115,000.  The individual awards to the named plaintiffs range from $5000 to $10,500 each.  Settlement XI.D.; Pls.' M. 74-75.

---

[4] Defense counsel has already paid the cost of notice to the class.  See Hr'g Tr. 62:14-21.

D.    <u>Class Notice</u>

Counsel retained Rust Consulting, Inc., a settlement administrator that specializes in class action notification and settlement administration ("settlement administrator"), to facilitate notice of the settlement.  Pls.' M. 11 and Declaration of Amy L. Lake Regarding Proof of Mailing Notice to Settlement Class, Establishing a Toll-Free Information Center, and Establishing a Website ¶¶ 2-3 ("Lake Decl.") attached to Pls.' M.

On August 28, 2009, the settlement administrator disseminated 387,263 copies of the Court-approved class notice package to the last known addresses of the class members via first class, postage pre-paid mail.  The class notice described the action, the applicable terms, and the class's claims.  It discussed the class members' right to be heard at the fairness hearing, their right to exclude themselves from or object to the settlement, and the procedure to effectuate an exclusion or objection.  It also discussed the binding effect of the settlement for those who chose not to opt out.  The class notice package included appendices that defined key terms, listed the policies covered by the settlement, demonstrated the bonus percentage for enhanced general policy relief, explained the scoring guidelines for claim process relief, and provided the various election forms necessary to effectuate specific forms of relief.  Lake Decl. ¶¶ 6-9 and Ex. B.

The settlement administrator used an address verification service to research all mailed class packages that were returned with no forwarding address.  Over 11,000 out of 19,800 class notice packages that were returned as undeliverable with no forwarding address were successfully remailed.  Lake Decl. ¶¶ 7-12.

The settlement administrator also established a toll-free call center staffed with 50 customer service representatives who were trained by the parties and the settlement administrator to answer class members' questions.  The class notice included the call center's phone number.  The center answered over 41,400 calls from 23,175 class-member callers.  Lake Decl. ¶¶ 16-17.

When customer service representatives were unable to answer class members' questions, they referred the class members to class counsel.  Class counsel answered hundreds of class members' questions.  Counsel also helped class members choose a form of relief, provided the class members' circumstances, and helped class members complete any applicable paperwork.  Class counsel told class members to call any time in the future for advice about the settlement, and class counsel anticipates receiving such calls in the subsequent months.  Declaration of J. Martin Futrell, Esq. ¶¶ 2-7, attached to Pls.' M.; Declaration of Cristina M. Pierson, Esq. ¶¶ 3-9, attached to Pls.' M.

The settlement administrator also established and

maintained an internet website containing class notice
information.  The site was made available to the public on August
28, 2009, and it contained copies of the settlement, the Court's
preliminary approval order, the form of escrow agreement, the
class notice and the election and claim forms.  The website also
included the settlement administrator's phone number and answers
to frequently asked questions.  As of October 28, 2009, there had
been 13,936 visits to the website.  Lake Decl. ¶¶ 13-14.

    E.   <u>Response to the Settlement</u>

      Eight hundred seventy-four class members requested
exclusion from the settlement.  Eight hundred thirty-nine sent
their requests by the opt-out deadline.  One class member filed a
motion for exclusion after the deadline passed, which the Court
granted.  The exclusion rate amounts to 0.2% of the settlement
class.[5]  Lake Decl. Exs. F, G.

      Twelve class members object to the settlement and ten
objection documents were filed.  These numbers include three
objectors who filed their objections past the objection
deadline.[6]  The twelve objectors amount to 0.003% of the

---

[5] The settlement administrator also received twenty-nine
exclusion requests from non-class members.  <u>See</u> Lake Decl. Ex. H.

[6]  James D. Bowman submitted his objection to the Court on
November 2, 2009.  Although Mr. Bowman did not file a motion for
leave to submit a late objection, the Court will consider his
objection.  Robert and Lynne Lisco moved for leave to file a late

settlement class.  All but three objectors are pro se.  Lake

Decl. Ex. E; Letter from James D. Bowman, Class Member, to the

Court (Oct. 29, 2009).

The substance of the objections involve an array of

complaints.  Some objectors request relief specific to their

circumstances or state that the settlement is unfair to the

defendants.  Others object to the attorneys' fee request, and one

objects to the named plaintiffs' incentive award.  Some

objections state that the settlement and notice are overly

complex.  One objector protests his inability to both object to

and seek exclusion from the settlement.  Several objectors take

issue with specific terms of the settlement stipulation,

including the release of the defendants' agents, the mechanics of

the claim review process, the size of the benefits, and the

sufficiency of the non-economic relief.  Lake Decl. Ex. E.

Having received notice of the settlement stipulation,

pursuant to CAFA, the Attorney General of Pennsylvania and the

Attorney General of Texas on behalf of the Texas Department of

Insurance filed amicus briefs in opposition to the settlement.

Both attorneys general argue, first, that the release improperly

---

objection.  The Court granted the motion on November 19, 2009.
The Court will not consider the objections from Bruno and Nancy
Leginski.  The Leginskis submitted an exclusion with their
objections and are considered excluded class members.  As such,
they may not object to the settlement.  See Settlement IX.A;
Notice 24.

prohibits, or at least chills, class members from participating, as witnesses or otherwise, in regulatory actions brought by the attorneys general. They argue that this limit on participation handicaps the states' abilities to enforce their laws. They argue, second, that the release improperly attempts to limit the claims and relief of pending or future regulatory actions brought by the attorneys general against the releasees. The Texas Attorney General additionally argues that the claim review process provides inadequate relief.

      F.   <u>The Fairness Hearing</u>

The Court held a fairness hearing on November 6, 2009. Counsel for both the plaintiffs and the defendants appeared at the fairness hearing and spoke on behalf of their clients. No attorneys or objectors made an appearance.[7]

Attorney John Abel, counsel on behalf of the Pennsylvania Attorney General's Office, appeared and explained the attorney general's views regarding class member participation in state regulatory actions and the release's impact on claims and relief in pending and future state regulatory actions. Hr'g

---

[7] Two attorneys filed a notice to appear on behalf of three objectors, Martha Michael and Lynne and Robert Lisco. No objectors sought appearance otherwise. Counsel for Ms. Michael subsequently withdrew the notice of appearance. Counsel for the Liscos did not appear. Attorney Gary Lightman appeared on behalf of his clients, individual plaintiffs who opted out of the settlement.

Tr. 7:24-8:5, 33:4-57:8.

With regard to the participation concerns, counsel for the plaintiffs and the defendants and Attorney Abel presented the Court with an amended release to address this issue.  The amendment, which the attorneys requested to be attached to the end of two specified paragraphs of the release, states:

> Nothing in this Order shall be construed to impede, impinge, impair or prevent in any fashion any Named Plaintiff and/or Class Member from responding to, cooperating in or communicating with any state, federal or local government body or official or any attorney representing a private party, including, without limitation, appearance as a witness for testimony or the production of information.

Hr'g Tr. 58:18-25.

With regard to the release's impact on claims and relief in pending and future regulatory actions, the plaintiffs' counsel argued that the release extends only to the claims the plaintiffs have, and it does not release claims held by the attorneys general.  Additionally, the plaintiffs' counsel and the defendants' counsel argued, and Attorney Abel agreed, that this action was not the appropriate forum to determine whether the release forecloses any particular claim or remedy.

II.  <u>Analysis</u>

The Court first addresses the issue of class certification for the settlement class and the notice sent to the

class members.  The Court then analyzes the fairness of the settlement and the proposed attorneys' fees, costs, and payments to the named plaintiffs.

A.    Class Certification

When presented with an unopposed motion for class certification and settlement approval, a court must separate its analysis of the class certification issue from its evaluation of the settlement's fairness.  See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 257 (3d Cir. 2009).  To certify a class under Federal Rule of Civil Procedure Rule 23, a court must find that the action satisfies all four requirements of Rule 23(a) and that the action is maintainable under Rule 23(b)(1), (2), or (3). Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997).

The settlement class in this case includes all persons and entities that purchased company annuities issued during the class period and all persons and entities to which an ownership interest in such annuities was subsequently assigned or transferred, or that otherwise held any interests as an owner in such company annuities, during the class period.  The class period commences on January 1, 1998, and it extends to and includes July 28, 2009.

1.    Analysis Under Rule 23(a)

Rule 23(a) sets forth four requirements for class

certification: numerosity, commonality, typicality, and adequacy of representation.  See Amchem Prods., 521 U.S. at 613.  The Court finds that the class meets these four requirements.

### a.   Numerosity

Rule 23(a)(1) requires a finding that the class is so numerous that joinder of all class members is impracticable. Although there is no precise number for establishing numerosity, classes that exceed forty or more class members generally satisfy this prerequisite.  See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).  The settlement class in this action consists of approximately 387,000 individuals.  Because joinder of these individuals is impracticable, the plaintiffs satisfy the numerosity requirement.

### b.   Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class.  If class members share at least one question of law or fact in common, factual differences among the class members' claims do not defeat certification.  In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions ("Prudential II"), 148 F.3d 283, 309-10 (3d Cir. 1998).

In this action, questions of law and fact necessary to prove the plaintiffs' RICO and state law claims are common to the class and satisfy the commonality requirement.  For example, the

plaintiffs would need to establish whether the defendants developed, used, and taught deceptive practices to the sales agents and whether the defendants created or approved deceptive materials to be distributed to all purchasers.

### c.   Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class.  The typicality requirement ensures that the class representatives' interests are aligned with those of the absent class members, so that the representatives work to benefit the class as a whole.  Prudential II, 148 F.3d at 311.  When the representatives' claims and those of the absent class members arise from the same course of conduct and are based on the same legal theories, the class satisfies typicality, irrespective of factual differences underlying the individual claims.  Baby Neal v. Casey, 43 F.3d 48, 57-58 (3d Cir. 1994).

In this action, all of the plaintiffs' claims arise from the same allegation that the defendants engaged in a scheme to sell long-term deferred annuities to purchasers by using fraudulent misrepresentations.  Because this matter challenges the defendants' uniform course of conduct as it affects the entire class, the class satisfies typicality.

d.   <u>Adequacy of Representation</u>

Rule 24(a)(4) requires a court to find that the representative parties will fairly and adequately protect the interests of the class. The representation inquiry is a two-pronged analysis, testing the qualifications of counsel to represent the class and determining whether any conflicts of interest exist between the class representatives and the absent class members. <u>See</u> <u>Prudential II</u>, 148 F.3d at 312. The adequacy of representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a). <u>Amchem</u>, 521 U.S. at 626 n.20.

In regard to the qualifications of counsel, the Court finds that the plaintiffs' counsel is experienced and able to conduct the litigation on behalf of the class. Lead Attorneys Marcus, Auerbach, and Hargrove each have extensive experience in prosecuting class actions and complex litigations. Mr. Marcus and Mr. Auerbach have served as lead counsel in several consumer class actions, including class actions involving insurance products. Additionally, Mr. Hargrove prosecuted the first class action certified in any court that addressed equity-indexed annuity products. <u>See</u> Declaration of Jonathan Auerbach, Esq. Ex. 1 ("Auerbach Decl."), attached to Pls.' M.; Declaration of John R. Hargrove, Esq. ¶¶ 3-5 ("Hargrove Decl."), attached to Pls.' M.

In regard to conflicts of interest between the class representatives and the absent class members, the Court finds no conflicts that defeat certification. The crux of this class action centers on the allegation that the defendants engaged in a scheme to defraud policyholders. Both the named plaintiffs and the absent class members have claims that arise from the same course of conduct by the defendants and they seek the same remedies.

### 2. Analysis Under Rule 23(b)

After a court determines that an action meets the requirements of Rule 23(a), it must consider whether the action is maintainable under one of the three parts of Rule 23(b). The plaintiffs seek to have this class certified under Rule 23(b)(3).

Rule 23(b)(3) requires the court to find that questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The Rule provides a non-exhaustive list of factors to aid the court in its determination: (1) the class members' interests in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already begun by or against class members, (3) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (4) the likely difficulties in managing a class action.  A district court need not inquire into the fourth factor when evaluating a settlement-only class certification.  <u>See</u> <u>Amchem</u>, 521 U.S. at 620.

### a.  <u>Predominance</u>

Under the predominance requirement, a court must determine that common questions of law or fact predominate over any questions affecting only individual members.  This requirement is more stringent than the commonality requirement of Rule 23(a).  <u>In re Ins. Brokerage Antitrust Litig.</u>, 579 F.3d at 266.  To establish predominance, the plaintiffs must show by a preponderance of the evidence that the elements of their claim can be proven by evidence common to all in their class.  <u>See</u> <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305, 311-12, 320 (3d Cir. 2008).

Courts have found that cases alleging a common scheme of deception through the use of uniform misrepresentations and omissions satisfy the predominance requirement.  <u>See</u> <u>Prudential II</u>, 148 F.3d at 314-15 (affirming finding of predominance for fraud allegation based in part on defendant's uniform sales materials containing statements at issue); <u>Iorio v. Asset Mktg. Inc.</u>, No. 05CV633 IEG (CAB), 2006 U.S. Dist. LEXIS 94948 (S.D.

Cal. July 26, 2006) (finding predominance for fraud allegation based on defendant's uniform written materials that contained alleged misrepresentations); Negrete v. Allianz Life Ins. Co. of N. Am., 238 F.R.D. 482, 491-92 (C.D. Cal. 2006) (finding predominance for RICO claim based on uniform written marketing materials and plaintiffs allegations of fraud).  Individual questions as to each investor's reliance on the misrepresentations do not prevent a finding of predominance. Prudential II, 148 F.3d at 315.

In this action, the plaintiffs allege that the defendants engaged in a common scheme to defraud the class members into purchasing long-term deferred annuities through uniform misrepresentations and omissions regarding the annuities products.  The plaintiffs provide evidence that the defendants: (1) required all agents to represent that the annuities were suitable for the purchasers, (2) required all agents to use the defendants' package of materials in every sale and to provide the package to every purchaser, and (3) required that all marketing documents relating to AmerUs products be drafted or approved by the defendants.  This evidence consists of uniform written materials that contain the alleged misrepresentations and omissions, and it is common to all in the class for proving the various fraud allegations.  Based on the plaintiffs' allegations and the record before the Court, the plaintiffs meet the

predominance requirement for class certification.  <u>See</u> Pls.'
Factual M. in Support of M. for Class Certification and in Opp.
to Defs.' M. for Summ. J. 21-22 and Exs. 19, 22, 24, 28, 30, 34
("M. for Certif.").

        b.   <u>Superiority</u>

       Under the superiority requirement, the court determines
whether a class action, rather than individual litigation, is the
best method for achieving a fair and efficient adjudication.  <u>See</u>
<u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d
154, 190 (3d Cir. 2001).

       A class action in this case is superior to other
methods of litigation.  First, class members are likely to lack
the financial incentive to litigate their suits individually
because most, if not all, of the class members' claims are modest
in light of the costs of litigation.[8]  <u>See</u> <u>In re Prudential Ins.</u>
<u>Co. of Am. Sales Practice Litig. Agent Actions ("Prudential I")</u>,
962 F. Supp. 450, 522-23 (D.N.J. 1997), <u>affirmed</u>, 148 F.3d at
315-16.  Second, class adjudication saves time, effort and the

---

[8] For example, Mr. and Mrs. Stein invested approximately
$20,000 in their deferred annuity.  Mary Lynch invested $65,000
of her $75,000 in life savings in her deferred annuity.  Mr. and
Mrs. Price invested approximately $61,000 in two separate
deferred annuities.  Dr. Healy invested approximately $107,000 in
his deferred annuity.  Ms. Ryles invested approximately $80,000
in her deferred annuities.  Ms. Edwards invested approximately
$27,000 in her deferred annuities.  Complaint ¶¶ 105, 125, 148,
147, 174, 200.

expense of litigating the claims of approximately 387,000 class members.  Third, there have been few individual suits on behalf of class members in light of the hundreds of thousands of claimants.

Finding that the requirements of Rule 23(a) and Rule 23(b)(3) are met, the Court hereby certifies the class as presented by the plaintiffs and unopposed by the defendants.

B.   Class Notice

Under Rule 23(c)(2)(B), notice must be given to potential class members by the best notice practicable under the circumstances for all classes certified under Rule 23(b)(3). This includes individual notice to all potential class members that can be identified through reasonable effort.  Notice must state in clear, concise and plain language: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues or defenses; (4) the class member's right to enter an appearance by an attorney; (5) the class member's right to be excluded from the class; (6) the time and manner for requesting exclusion; and (7) the binding effect of settlement on class members.  Fed. R. Civ. P. 23(c)(2)(B).  A court must determine that notice was appropriate before evaluating the merits of the settlement itself.  See e.g., Prudential II, 148 F.3d at 326-27.

Two objectors, James D. Bowman and Martha Michael,

object to the settlement on the grounds that the notice was overly complex. Mr. Bowman argues that the notice was too complicated for class members to elect the relief they wanted without professional help. Ms. Michael argues that the notice was too long and written in too small of a font, the description of the relief was confusing, and the term "releasees," as used in the notice, required a burdensome cross-reference to the settlement itself.

The Court finds these objections unpersuasive and holds that the notice to the class members met the requirements of Rule 23(c)(2)(B). The settlement administrator sent individual notice packages to 387,263 individuals, and of the 19,800 packages that were returned as undeliverable, 11,000 were successfully remailed. The notice was written in simple English and was readily understandable by the class, as demonstrated by the small number of objectors. It described the action, the applicable terms, and the class's claims. It discussed the class members' right to be heard at the fairness hearing through appearance by counsel or otherwise, their right to exclude themselves from or object to the settlement, and the procedure to effectuate an exclusion or objection. It also discussed the binding effect of the settlement for those who chose not to opt out.

The notice was no more complicated than necessary for the class members to understand a complex settlement that settles

the complex litigation.  The length of the notice, totaling

eighteen pages of content and ten pages of appendices, and

including the two election forms for enhanced general policy

relief and claim process relief, was necessary to provide class

members with the information they needed to understand the

settlement and the forms they needed to elect specific relief.

It included a summary, a table of contents, and detailed answers

that explained the facets of the settlement.  The appendices

provided definitions of key terms, a review of the claim scoring

process, and a table demonstrating the bonus percentages.  Class

members with questions could seek more information on the

settlement website, which featured answers to frequently asked

questions, relevant documents, and printable versions of the two

election forms.  Class members could also speak with customer

service representatives and class counsel if they had further

questions.

C.  <u>Approval of the Settlement</u>[9]

     The plaintiffs explain that their decision to settle is based upon consideration of: (1) the fairness, reasonableness and adequacy of the settlement stipulation; (2) the substantial risks and uncertainties of protracted litigation and trial, especially in complex actions such as this, as well as the difficulties, delays and risks of adverse results inherent in such litigation; (3) the needs and interests of the class members; and (4) the desirability of consummating the settlement stipulation promptly, in order to provide effective relief to the class members.  Pls.' M. 6-7.

     Pursuant to Federal Rule of Civil Procedure Rule 23(e), in order for a court to approve a class settlement, it must find that the settlement is fair, reasonable and adequate.  <u>See</u> <u>In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d 768, 785 (3d Cir. 1995).  When considering a class settlement, the "court plays the important role of protector of

---

[9] The Court has jurisdiction to rule on the settlement.  The Court has federal question subject matter jurisdiction over the plaintiffs' two RICO claims.  <u>See</u> 18 U.S.C. § 1964.  The Court has supplemental jurisdiction over the plaintiffs' state law claims because the claims are part of the same case or controversy as the RICO claims.  <u>See</u> 28 U.S.C. § 1367.  The Court has personal jurisdiction over the plaintiffs and the absent class members based on the notice provided to all class members, which informed them of the nature of the litigation, their opportunity to be heard and their opportunity to withdraw from the class.  <u>See</u> <u>Prudential II</u>, 148 F.3d at 306 (citing <u>Phillips Petroleum v. Shutts</u>, 472 U.S. 767, 811-12 (1985)).

the [absent class members'] interests, in a sort of fiduciary capacity." Id. at 784.

In Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975), the Court of Appeals for the Third Circuit established the following nine factors that a district court should consider to determine whether a settlement is fair, reasonable and adequate: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater settlement; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of the attendant risks of litigation. Id. at 157.

A preliminary approval of the settlement establishes an initial presumption of fairness when the court finds: (1) the negotiations occurred at arm's length, (2) there was sufficient discovery, (3) the proponents of the settlement are experienced in similar litigation, and (4) only a small fraction of the class objected. In re Gen. Motors, 55 F.3d at 785.

The Court finds an initial presumption of fairness for the settlement. Further, in applying the Girsh factors, the

Court is satisfied that the settlement is fair, reasonable and adequate to the class members.

### 1. Initial Presumption of Fairness

The Court preliminarily approved the settlement on July 28, 2009, and it finds that there is an initial presumption of fairness because the settlement meets all four of the factors that create the presumption. First, the settlement negotiations occurred at arm's length. The parties reached the settlement stipulation after protracted negotiations over the course of one year. The negotiations encompassed several rounds of mediation with Professor Green, who is extremely experienced in mediating large, complex cases such as this one. The parties also talked without Professor Green, in order to move along their discussions.

Second, the parties conducted sufficient discovery. Class counsel reviewed hundreds of thousands of pages of documents and took nine depositions of corporate designees and employees. They retained three experts and attached thirty-five exhibits to support their motion for class certification and their opposition to the defendants' motion for summary judgment.

Third, the plaintiffs' counsel is extremely experienced in matters similar to the one at hand. The attorneys have served as lead counsel in numerous class actions on behalf of insureds

and other parties against insurance companies and have previously litigated long-term annuities suits.

Fourth, a very small fraction of the class has objected to the settlement.  Notice was sent to 387,263 potential class members.  Of those, only 12 objected.  The percentage of objectors is only 0.003% of the entire class.

### 2.   The Girsh Factors

Having established a presumption of fairness for the settlement, the Court turns to the <u>Girsh</u> factors and finds that they weigh in favor of settlement approval.

#### a.   The Complexity, Expense and Likely Duration of the Litigation

The first <u>Girsh</u> factor, the complexity, expense, and likely duration of the litigation, weighs in favor of the Court finding that the settlement stipulation is fair, reasonable and adequate.  The action involves numerous complex legal questions and defenses.  If the case were to proceed in litigation, it would require an enormous outlay of time, money and energy from all of the parties, above and beyond the amount that they have expended in the five years that this action has been pending. The plaintiffs' RICO claims add to the complexity of this already complicated case because of the novel issues they present.  The settlement avoids all of the costly uncertainty discussed above,

and instead, provides class members with certain, timely relief.

   b.   <u>The Reaction of the Class to the Settlement</u>

   The second factor, the reaction of the class, also favors approval of the settlement.  The number of class members who sought exclusion or who object to the settlement stipulation demonstrates class-wide approval of the settlement.  The substance of the objections also fails to present an obstacle to final approval.  Further, the Court finds the states attorneys' general arguments for rejecting the settlement to be unpersuasive.

   (1)   <u>Objections and Exclusions</u>

   The low percentage of objections and exclusions to the settlement stipulation demonstrates class support for the settlement.  Only 12 out of 387,263 class members object to the settlement and only 840 were excluded.

   The disparity between the number of potential class members and the number of objectors creates a strong presumption in favor of the settlement.  <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 235 (3d Cir. 2001).  Here, the disparity between the objectors and the potential class is great: only 0.003% of the settlement class objected.

   The 840 exclusions amount to only 0.2% of the class, also demonstrating the class's approval of the settlement.  The

Court of Appeals for the Third Circuit previously affirmed a district court's finding that 0.2% of exclusions weighs in favor of settlement approval.  Prudential II, 148 F.3d at 318. Further, the percentages of the objections and exclusions in this action are similar to or lower than other approved class action settlements for cases alleging fraudulent investment sales practices.[10]

In light of the investigations class members made into the settlement, the low numbers of objections and exclusions demonstrate the class's affirmative endorsement of the settlement.  Approximately 23,175 class members called the toll-free telephone number for information about the settlement, and yet only 12 class members object and only 840 were excluded.

Upon consideration of the substance of the objections, the issues raised by the objectors do not present an obstacle to final approval of the settlement.

_____

[10] See e.g., Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 237 (D.N.J. 2005) (approving settlement with 0.06% exclusions and 0.003% objections in insurance fraud class action); In re Metro. Life Ins. Co. Sales Practices Litig., Misc. Docket No. 96-179, MDL No. 1091, 1999 U.S. Dist. LEXIS 22688, at *79-80 (W.D. Pa. Dec. 28, 1999) (approving settlement with 0.33% exclusions and 0.003% objections in annuities' fraud class action); Prudential I, 962 F. Supp. at 537 (approving settlement with 0.2% exclusions and 0.003% objections in insurance fraud class action).

Four of the twelve objectors, Robert E. Seikel,[11] Dallas J. Raby, Phillis A. Raby, and Michael Gopoian, object to the settlement for personal reasons.  Mr. Seikel and Mr. and Mrs. Raby object because they did not experience any wrongdoing by the defendants.  Mr. Gopoian objects because he wants to recover $430 from a charge on his account.  These four personal complaints do not upset the settlement's fairness to the class as a whole.  See Elkins v. Equitable Life Ins. Co., Civil Action No. 96-296-CIV-T-17B, 1998 U.S. Dist. LEXIS 1557, at *90-91 (M.D. Fla. Jan 28, 1998).

Two objectors to the settlement, David D. Dalquist and Jonathan Upchurch on behalf of Edith M. Newcomer, object based on a misunderstanding of the settlement terms, and therefore their objections do not affect the settlement's fairness.  Mr. Dalquist protests the inability to transfer his funds to another provider via a non-taxable transfer, and Mr. Upchurch protests the lack of benefits for death benefits contracts.  Because both forms of relief sought by the objectors are available under the settlement stipulation, the objections lack merit.

------------------------------------------------------------

[11] Mr. Seikel also objects because class members cannot both exclude themselves from the settlement and object to it.  The Court overrules this objection.  Courts routinely approve settlements with such limitations.  See e.g., Olden v. Gardner, 294 Fed. Appx. 210, 216 (6th Cir. 2008); Elkins v. Equitable Life Ins. Co., Civil Action No. 96-296-CIV-T-17B, 1998 U.S. Dist. LEXIS 1557, at *16 (M.D. Fla. Jan. 28, 1998).

Four objectors find the settlement's relief
insufficient.  James D. Bowman argues that the claim review
process is unfair because the defendants choose the claim scorers
and the class members must prove, without knowing the law, that
the defendants engaged in misconduct.  Ms. Michael objects to the
claim review process because, unlike a settlement reached between
the Minnesota Attorney General and the defendants, the relief in
this settlement stipulation does not include rescission and a
full refund of the class members' investments.  Ms. Michael also
finds the release of the defendants' agents to be overly broad
and without consideration.[12]  Robert and Lynne Lisco, through
their attorney, object to the relief, finding the value "meager"
compared to possible relief available under Illinois state

---

[12] Ms. Michael objects further on the grounds that the non-economic relief is insufficient because it lacks monitoring and enforcement provisions, and the claim review process calls into question the predominance and superiority requirements under Rule 23(b)(3).  She also argues that the settlement is unfair because the bonuses will be funded at the expense of class members through internal manipulations of the annuities' interest rates.

    The Court overrules these objections.  First, the Court finds the non-economic relief fair and notes that, during the pendency of this action, the Securities and Exchange Commission issued a rule changing the way and by whom these products can be sold.  Second, as stated above, the Court finds that this class meets the requirements for class certification.  Third, the terms of the settlement expressly prohibit the internal manipulations that Ms. Michael fears.  The plaintiffs' interest rate is the greater of three terms: two percent, the company's market rate at the time the payments are made, and the rate that is in the policy.  See Notice 17; Hr'g Tr. 27:17-18:8, 53:12-54:20.

statutes.  They urge the Court to reject the settlement for class
members from Illinois above the age of 60.[13]

The Court finds these objections unpersuasive.  First,
the claim review process is only one form of relief afforded to
class members in the settlement.  Unlike the Minnesota settlement
agreement, reached for a class comprising 0.9% of this settlement
class and which solely affords a claim review process, class
members have the option of the claim review process or general
policy relief.  Class members thus need not prove that the
defendants engaged in misconduct in order to receive benefits,
and therefore their relief options are broader than those
provided under the Minnesota agreement.  See Pls.' M. 31; Hr'g
Tr. 26:2-32:20.

Second, the release of agents is a necessary component
of the settlement agreement in order to provide finality.
Otherwise, dissatisfied policyholders could sue the defendants'
agents who would then, in turn, look to the defendants for
indemnity or contribution.  Prudential I, 962 F. Supp. at 559;
See Prudential II, 148 F.3d at 326 (affirming release of all

---

[13]  Robert and Lynne Lisco also object to the fact that they
did not receive the aggregate value of the settlement until
November 2, 2009, when they reviewed the plaintiffs' motion for
final approval of settlement, which included the expert's
calculation.  The Court overrules this objection.  The Liscos do
not explain why they object to the date of the release of the
settlement's aggregate value, nor how the date of the release
harmed them.

claims that arise out of the same conduct as alleged in the complaint).[14]

(2)  Amicus Briefs from the Pennsylvania and
                 Texas Attorneys General

The attorneys general from Pennsylvania and Texas submitted amicus briefs to the Court in opposition to the settlement stipulation.  Both attorneys general argue that the settlement stipulation release is excessively broad because it prohibits class members from participating, as witnesses or otherwise, in regulatory actions against the releasees.  They argue further that the release improperly attempts to foreclose parens patriae claims and restitution to class members as a form of relief that the attorneys general might seek in their own litigation against the defendants.  Penn. Br. 5-7; Tex. Br. 9-11.

Attorney Abel and counsel for the plaintiffs and defendants worked together at the fairness hearing to address the attorneys' general participation concerns.  They requested that the Court amend the release to explicitly allow class members to respond to, cooperate in and communicate with regulatory bodies investigating the defendants' behavior.  The Court approves the amendment to the release and adopts it into its Final Order.

_____

[14] Five objectors, two of whom object on no other grounds, object to the settlement's proposed attorneys' fees.  These objectors' arguments are addressed in the attorneys' fees section of the Memorandum.

In terms of foreclosed claims or relief, the issue of whether a parens patriae claim or restitution remedy may be foreclosed because of the release is not currently before the Court. The defendants in this action are entitled to a release of all claims held by class members in exchange for providing the relief outlined in the settlement. The attorneys' general law enforcement powers are not claims the plaintiffs have, and as such, the plaintiffs do not release any of these claims.

In addition to the concerns about the release, the Texas Attorney General argues that the relief available under the claim review process is inadequate. The attorney general argues that class members seeking this relief who receive the two highest possible scores by demonstrating fraud should recoup a full refund of surrender charges.

The Court disagrees. Although the claim review process does not provide the opportunity to receive a full refund of surrender charges, it does provide significant concessions that benefit class members. The defendants cannot cross examine the class members who elect this form of relief in order to undercut the class members' allegations.

The Court must consider whether the relief provided in the settlement stipulation, taken as a whole, is fair, adequate and reasonable to the class members. Upon consideration of the class's reaction to the proposed settlement stipulation, and in

light of the attorneys' general arguments, the Court finds that the reaction of the class to the settlement weighs in favor of final approval.

### c. The Stage of the Proceedings and the Amount of Discovery Completed

The third factor, the stage of the proceedings and the amount of discovery, similarly weighs toward acceptance of the settlement. Post-discovery settlements are more likely to reflect the true value of the claim. Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993).

Here, the settlement was achieved after years of litigation. The Court has considered motions to dismiss and numerous other pretrial disputes. The parties have produced more than 200,000 documents, taken 21 depositions, and retained several experts. The parties briefed motions for summary judgment and class certification. The current docket includes 459 docket entries, 421 of which preceded the proposed settlement. This background proves that the parties had a tremendous "appreciation of the merits of the case before negotiating." In re Gen. Motors, 55 F.3d at 813.

### d. The Risks of Establishing Liability and Damages

The fourth and fifth factors, the risks of establishing liability and the risks of establishing damages, weigh in favor

of settlement.  As to liability, first, the plaintiffs have
already faced significant challenges by bringing civil RICO
claims, which the Court dismissed once and which present
complexities.  See McCarter v. Mitcham, 883 F.2d 196, 208 (3d
Cir. 1989) (Sloviter, J., dissenting in part, concurring in
part).

Second, the defendants filed a comprehensive motion for
summary judgment.  The motion challenges the plaintiffs' ability
to bring their RICO and state law claims, and it also argues that
the RICO claims are preempted by the McCarren-Ferguson Act and
barred by the filed rate doctrine.  These arguments raise
difficult issues, the outcome of which is uncertain.

Third, even if this action survived summary judgment,
the trial would be complex and risky.  It would involve intricate
actuarial and financial analysis of the defendants' annuities and
an inevitable battle of the experts.  See Prudential I, 962 F.
Supp. at 539 (noting the risks of establishing liability because
of opposing expert witnesses).

As to damages, the plaintiffs would struggle to prove a
damage amount.  The plaintiffs allege that the defendants
misrepresented the character of the annuities during the sales of
the policies.  These allegations do not lend themselves to
straightforward damage calculations, and the plaintiffs may have

difficulty proving a monetary figure based on this harm.

      e.    The Risks of Maintaining the Class Through
             Trial

The sixth <u>Girsh</u> factor, the risk of maintaining the class action through trial, is a neutral issue in this case. There is always some risk of decertification in any class action.

      f.    The Ability of the Defendants to Withstand a
             Greater Settlement

The seventh <u>Girsh</u> factor, the ability of the defendants to withstand a greater judgment, is also neutral. The plaintiffs' expert Dr. Reichenstein valued the settlement to range from approximately $185,250,000 to $549,250,000, including the sought attorneys' fees, expenses, and costs of settlement administration, all of which the defendants are to pay. There is no reason to think that the defendants, comprising major corporations, would be unable to withstand a greater judgment.

      g.    The Reasonableness of the Settlement in Light
             of the Best Possible Recovery and the
             Attendant Risks of Litigation

The eighth and ninth <u>Girsh</u> factors, the reasonableness of the settlement in light of the best possible recovery and the attendant risks of litigation, support approval of the settlement. The thrust of the plaintiffs allegations is that the

defendants products are illiquid. The settlement relief

liquifies the annuities and allows class members to receive

immediate payments and bonuses. Class members who can establish

fraud can receive even greater relief. The reasonableness of the

settlement is reinforced by the fact that annuities are

inherently illiquid products. By nature, they are long-term

investments that provide long-term payouts. Further, the

settlement is commensurate with other cases involving annuity

sales practices.[15]

Dr. Reichenstein, who has studied annuities for more

than two decades, estimates that the total settlement relief

ranges between $166 million to $530 million. Class counsel

believe that the settlement value will surpass the low estimation

because, by the time of the fairness hearing, class participation

was already higher than what Dr. Reichenstein had anticipated

---

[15] See Strube v. Am. Equity Life Ins. Co., Case No.
6:01-cv-1236-Orl-19DAB, 2006 U.S. Dist. LEXIS 28582 at *7 (M.D.
Fla. May 5, 2006) (noting approved settlement offering election
of immediate 2% annuitization bonus to annuity values or a claim
review process); Grove v. Principal Mut. Life Ins. Co., 200
F.R.D. 434, 437-38 (S.D. Iowa 2001) (approving settlement
comprising death benefits in the form of free term life insurance
or claim review process); Snell v. Allianz Life Ins. Co. of N.
Am., Civ. No. 97-2784 (RLE), 2000 U.S. Dist. LEXIS 13611 (D.
Minn. Sept. 8, 2000) (approving settlement comprising election of
benefits and bonuses based on policies or a claim review
process).

when calculating the low figure.[16]  Hr'g Tr. 67:20-68:4.

     After finding a presumption of fairness for the
settlement and applying the <u>Girsh</u> factors, the Court concludes
that the settlement is fair, reasonable and adequate under Rule
23(e).  All but two of the <u>Girsh</u> factors weigh in favor of
approving the settlement.  The two factors that do not weigh in
favor are merely neutral.  For these reasons, the Court approves
the settlement under 23(e).

     C.     <u>Attorneys Fees and Expenses</u>

     Class counsel in a class action who recovers a common
fund for the benefit of persons other than himself or his client
is entitled to a fair and reasonable award of attorneys' fees
from the fund as a whole.  <u>Boeing Co. v. Van Gemert</u>, 444 U.S.
472, 478 (1980).  The Court of Appeals for the Third Circuit
favors the percentage-of-recovery method for fee calculation in
common fund cases.  <u>Prudential II</u>, 148 F.3d at 333.  It also
approves a district court's use of this method when evaluating
settlements that involve an uncapped valuation dependent upon the
relief class members seek.  <u>Id.</u>  Class counsel in this action

---

     [16]  The nonmonetary relief also adds to the settlement's
fairness. It prevents the defendants from engaging in the alleged
sales practices in the future by requiring the defendants to
undertake changes in the marketing and sales of annuities and
other insurance products.

used the percentage-of-recovery method to calculate the proposed fee award.  It also used the lodestar method, the alternative method of fee calculation, as a cross-check to ensure that the fee amount is reasonable.  See In re Ins. Brokerage Antitrust Litig., 579 F.3d at 280.

As a result of these calculations and the calculations of Dr. Reichenstein, class counsel seeks an award of attorneys' fees between 3% and 9% of the settlement valuation, based on the estimated high and low of the settlement total.  This fee award amounts to $17,699,840.50.  Class counsel also requests $550,159.50 for reimbursement of its out-of-pocket expenses.[17]

The Court finds that the attorneys' fees and expenses request is reasonable, and it grants class counsel's request.

### 1.    The Reasonableness of the Fees

The Court of Appeals for the Third Circuit requires district courts to consider seven factors when determining the reasonableness of a fee calculated via the percentage-of-recovery method.  Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 2000).  They are: (1) the size of the fund created and number of persons benefitted, (2) the presence or absence of substantial

_____

[17] The fee award does not include the costs of settlement administration, of which, as stated above, the defendants have agreed to pay.

objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by the plaintiffs' counsel, and (7) the awards in similar cases. Id. at 195 n.1. All factors weigh in favor of approving the attorneys' fee petition in this case.

The fourth factor, the complexity and duration of the litigation, is the first a district court can and should consider when awarding fees. Id. at 197. This factor weighs in favor of class counsel's fee request. The plaintiffs' case involves complex legal issues including alleged violations of RICO and a conspiracy to violate RICO, along with various state law claims. The litigation has been pending for more than five years, and class counsel has conducted extensive discovery, having reviewed hundreds of thousands of documents and conducted numerous depositions of the defendants' agents and corporate designees. Class counsel has also retained experts to analyze the defendants' annuity products, and it has filed several complex motions and defended against several such motions.

The first factor, the size of the fund created and the number of persons benefitted, also favors the fee award. Here, as calculated by Dr. Reichenstein, the proposed settlement value

is between $185,250,000 and $549,250,000, a value that includes class counsel's requested attorneys' fees and expenses and the costs of settlement administration. The attorneys' fee request of $17,699,840.50 equates to 3% to 9% of the value of the proposed settlement. This settlement award benefits over 387,000 individuals across the nation and serves approximately 474,000 policies.

The second factor, the number of substantial objections, also weighs in class counsel's favor. First, only five class members, Mr. Seikel, Mr. Bowman, Ms. Michael, Joseph A. Diggle and Douglas B. Young, object to the attorneys' fee request, stating that the request is too high and will affect the plaintiffs' dividends. The small number of objectors weighs in favor of fee approval, particularly because the section in the notice that described the sought attorneys fees was directly above the section that advised class members how to object to the settlement.

Second, the objectors do not substantiate their objections. None of the objectors presents evidence that the attorneys' award would affect the plaintiffs' dividends. See Prudential II, 148 F.3d at 336. Professor Green, who mediated the settlement, attested that the parties did not discuss the attorneys' fees and expenses until the parties agreed on the

material components of the settlement.  The small number of objections and the objections' lack of merit indicate that the class is satisfied with the fee award.  <u>See</u> <u>Varacallo v. Mass. Mut. Life Ins. Co.</u>, 226 F.R.D. 207, 251 (D.N.J. 2005) (finding that fewer than 50 objections to attorneys' fee request in a class of 3 million supported approval of fee award).

The third factor, the skill and efficiency of the attorneys involved, supports approval of the fee request.  Class counsel is highly skilled in this area and has extensive experience in litigating class actions on behalf of insureds and other parties against insurance companies.  Counsel for the defendants is nationally-recognized as being a leading firm in the defense of class actions and those involving insurance products.  Class counsel has vigorously litigated, and defense counsel has vigorously defended against, the claims on behalf of the class.  <u>See</u> Pls.' M. 68.

The fifth factor, the risk of nonpayment, also weighs in favor of the fee request.  Class counsel undertook representation on a contingency basis and advanced hundreds of thousands of dollars in expenses.  As stated above, this case involved complex issues of law, and class counsel prosecuted this case for more than five years, without any guarantee of payment.  Given the complexity of the case and the effort and risk involved

in prosecuting the action, the fee request is reasonable.

The sixth factor, the amount of time devoted by counsel, further supports the fee amount. Class counsel documents 16,212 hours of contingent work on this litigation. These hours worked justify the amount of the fee petition and are further confirmed by the reasonable outcome of the lodestar cross-check, discussed below. See Pls.' M. 70.

The seventh factor, the awards granted in similar cases, also supports the fee amount. Class counsel's sought fee award of 3% to 9% of the settlement amount fits comfortably within the range of approved fee amounts for similar cases. One district court in this circuit created a chart for fees in insurance sales practices cases and demonstrated that approved fees range between 6.5% and 14.5% for settlements valued between $90.1 million and $1.8 billion. Varacallo, 226 F.R.D. at 253-54. The Court of Appeals for the Third Circuit has approved a higher percentage than that sought by class counsel, affirming an award of 21.25% of a settlement valued at approximately $100 million. In re AT&T Corp. Secs. Litig., 455 F.3d 160, 167-170 (3d Cir. 2006).

The lodestar cross-check analysis further supports the reasonableness of the attorneys' fee request. Under the lodestar method, the court calculates the proper fee by multiplying the

number of hours spent on the litigation by an appropriate hourly rate, creating the lodestar calculation. See In re Gen. Motors, 55 F.3d at 819 n.37. The proposed fee is then divided by the lodestar calculation, resulting in a lodestar multiplier. In re AT&T Corp. Secs. Litig., 455 F.3d at 164. The multiplier attempts to account for the risk of nonrecovery and the quality of the attorneys' work. Id. at 164 n.4. Although the resulting multiplier need not fall within any pre-defined range, the Court of Appeals for the Third Circuit has noted that multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied. See Prudential II, 148 F.3d at 341.

In this case, the lodestar for class counsel is $7,942,757.50, based on counsel's current hourly rates that the firm customarily charges its hourly clients. The multiplier is 2.3 and is safely within the range of multipliers awarded in the Court of Appeals for the Third Circuit. See Auerbach Decl. ¶ 5 and Ex. 2; Hargrove Decl. ¶ 8 and Ex. 1; Declaration of Glenn Manochi, Esq. ¶ 5 and Ex. 1 ("Manochi Decl."), attached to Pls.' M.; Declaration of David S. Senoff ¶ 5 and Ex. 2 ("Senoff Decl."), attached to Pls.' M.; Declaration of Jacob A. Goldberg ¶ 5 and Ex. 2 ("Goldberg Decl."), attached to Pls.' M.

2. <u>Reimbursement of Out-of-Pocket Expenses</u>

Class counsel seeks $550,159.50 in expenses as part of its overall attorney award of $18.25 million. The attorneys comprising class counsel set forth their expenses in declarations accompanying the plaintiffs' motion for final approval of the settlement. The categories for expenses include: consulting and expert witness fees; mediation fees; photocopying; IT, legal research, and publications; mail and delivery charges; long distance charges; travel and living expenses; witness fees and service of process. <u>See</u> Auerbach Decl. ¶ 6 and Ex. 2; Hargrove Decl. ¶ 9 and Ex. 2; Manochi Decl. ¶ 6 and Ex. 1; Senoff Decl. ¶ 6 and Ex. 3; Goldberg Decl. ¶ 6 and Ex. 3.

The totals for each category are reasonable expenses for a large, complex, multi-year litigation. The Court therefore approves class counsel's request for a fee award of $17,699,840.50 and an out-of-pocket expenses award of $550,159.50.

D. <u>Incentive Payments to the Named Plaintiffs</u>

Class counsel requests incentive awards to the named plaintiffs in the aggregate amount of $115,000. Specifically, it seeks an award of $10,500 to Beryl Price, Charlotte Price, the Estate of Joseph Healy, George Miller, Richard Stein, Dena Stein, Mary Lynch, Dorothy Eddy, Evelyn Edwards, and Jean Ryles. It

also seeks an award of $5000 to Michael J. Quinn and Catherin M. Quinn.  The distribution of the incentive award reflects the named plaintiffs' involvement in the prosecution of the case and in discovery.  Mr. Diggle objects to the incentive awards requested, arguing that all of the plaintiffs should receive the same relief.

The Court finds that the incentive awards are reasonable compensation considering the extent of the named plaintiffs' involvement and the sacrifice of their anonymity. The named plaintiffs prepared for and testified in depositions that exposed their private financial affairs, they participated in preparing responses to interrogatories, and they produced an extensive amount of documents.  They undertook efforts that benefitted the class, and the Court finds these awards justified.

## III. <u>Conclusion</u>

For the reasons herein stated, the Court grants the plaintiffs' motion for final approval of settlement, class certification, and award of attorneys' fees and costs and incentive payments.  The Court hereby certifies the class and approves the settlement in this class action as described in that motion and as amended at the fairness hearing.

An appropriate Order shall issue separately.