IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


IN RE: AMERICAN INVESTORS      :      CIVIL ACTION
LIFE INSURANCE CO. ANNUITY     :
MARKETING AND SALES PRACTICES  :      NO. 05-md-1712
LITIGATION                     :      MDL DOCKET NO. 1712


MEMORANDUM

McLaughlin, J.                                    July 10, 2013


     The Aviva defendants[1] move the Court to enforce its final

order and judgment as it relates to claims for restitution in a

pending civil enforcement action commenced by the Commonwealth

of Pennsylvania.  The Attorney General of Pennsylvania has

initiated a lawsuit in state court, alleging that the Aviva

defendants violated the state's Unfair Trade Practices and

Consumer Protection Law.  The Aviva defendants now seek an

injunction against two named plaintiffs and settlement class

members, and all persons acting or purporting to act on their

behalf, from seeking or receiving restitution or monetary relief

from the defendants in connection with the Attorney General's

lawsuit.  The Court will grant the defendants' motion.

---

[1] The Aviva defendants are:  AmerUs Group Company and AmerUs
Annuity Group Company (now collectively known as Aviva USA
Corporation) and American Investors Life Insurance Company
(now known as Aviva Life and Annuity Company).

I.   Factual Background

        Defendants' motion pertains to this Court's supervision
and approval of a settlement agreement in the instant action, a
consolidated multidistrict litigation involving six putative
class action lawsuits.   In re Am. Investors Life Ins. Co.
Annuity Mktg. & Sales Practices Litig. (In re Am. Investors),
263 F.R.D. 226, 228-29 (E.D. Pa. 2009).   In brief, In re Am.
Investors involved defendants' marketing and sale of long-term
deferred annuity products.   The class action plaintiffs alleged
that defendants perpetrated a scheme to sell such products to
senior citizens by misrepresenting and omitting information on
the nature of the investments, inducing them to buy unnecessary
estate planning instruments and annuities.   Id. at 230.   The
oldest of these cases has been pending before the Court since
2004.   Id.


   A.   Terms of the Stipulation of Settlement

        On July 16, 2009, after five years of litigation,
plaintiffs filed their unopposed motion for preliminary approval
of a class-wide settlement, certification of the class, and an
order directing issuance of notice to the class.   Their motion

included a stipulation of settlement and a proposed form of class notice.  Id. at 229.

     The stipulation of settlement defined the class as "[a]ll persons and entities that purchased Company Annuities issued during the Class Period and all persons and entities to which an ownership interest in such Company Annuities was subsequently assigned or transferred, or that otherwise held any interest as an Owner in such Company Annuities, during the Class Period . . . ."  Id. at 230.  In total, the settlement class consisted of over 387,000 individuals.[2]  Id.

     Section X of the stipulation of settlement, entitled "Release and Waiver," explained the obligations taken on by the class members as part of the settlement.  In relevant part, it states:

> [T]he Named Plaintiffs and all Class Members, on
> behalf of themselves . . . and any other person or
> entity purporting to claim on their behalf, hereby
> expressly and generally release and discharge the

---

[2] The class included the thirty-six individuals who are the focus of the instant motion.  See Herman Add'l Decl. ¶ 9, attached to Def. Mot. for Leave to File Add'l Decl., exh. 1 (Docket No. 555-1, at 4).  Included among the thirty-six individuals are two named plaintiffs, Beryl and Charlotte Price, who received incentive awards beyond their settlement amount.  Id.; see also In re Am. Investors, 2006 WL 1531152, at *1-2 (Jun. 2, 2006).

Releasees[3] from any and all causes of action, claims,
allegations of liability, damages, restitution,
equitable, legal and administrative relief, interest,
demands or rights whatsoever, including, without
limitation, for all claims of actual monetary damages,
for claims of injunctive or equitable type of relief,
and for claims of mental anguish and/or punitive or
exemplary damages, whether such claims are based on
federal, state, or local law, statute, ordinance, or
regulation (including, without limitation, federal or
state insurance laws or regulations, RICO type laws,
and securities laws or regulations), contract, common
law, or any other source, relating to any Company
Annuities and that were or could have been asserted
against Defendants in the Complaint or any other
complaint encompassed in the Action . . . or relating
in any way to the Released Transactions,[4] and whether

---

[3] Section X of the stipulation defined "Releasees" as
"[i]ndividually and collectively, the Defendants and Other
Defendants and the Defendants' and Other Defendants' respective
past, present, and future parent companies, subsidiaries,
affiliates, predecessors, successors and assigns . . . ." Id.
at 247.

[4] Section X of the stipulation defined "Released Transactions"
as:

> (a) the design, development, marketing, offer,
> solicitation, application, underwriting, acceptance,
> issuance, sale (including, without limitation, in
> connection with the issuance of a Company Annuity as a
> replacement for a non-Company annuity or another
> Company Annuity), presentation, illustration,
> projection, purchase, operation, performance, interest
> crediting, charges, administration, servicing,
> retention, and/or replacement (by means of surrender,
> partial surrender, loans respecting, withdrawal and/or
> termination of any annuity) of or in connection with
> (1) the Contracts or (2) any annuity sold or to be
> sold or offered in connection with, or relating in any
> way directly or indirectly to the sale or solicitation
> of, the Contracts, or external or internal
> replacements of annuities issued by the Companies, (b)

4

or not brought directly, indirectly, on a
representative basis, or otherwise, including, but not
limited to, actions brought on behalf of the Named
Plaintiffs and/or Class Members by any state or
federal government officials or agencies.

Id. at 248.  In addition, Section X stated that plaintiffs

agreed not to "institute, maintain, assert, join, or participate

in, either directly or indirectly" any action against the

Releasees "asserting causes of action, claims, allegations of

liability, damages, restitution, injunctive, equitable, legal or

administrative relief, interest, demands or rights" that were

related to the facts alleged in the Complaint or related "in any

way" to the Released Transactions.  Id. at 248-49.


   B.   Notice to Class Members

     The Court preliminarily approved the settlement and class

notice on July 28, 2009.  To disseminate the stipulation of

settlement, the class notice, and the date of the fairness

------

the marketing, sale, delivery, and/or performance of
any products, plans, or services in connection with,
or relating to or allegedly relating to, the
marketing, purchase, or sale of a Contract, and (c)
any and all matters concerning or relating to this
Settlement (including, without limitation, the award,
election, and/or implementation of any Settlement
Relief with respect to a Contract).

Id. at 247-48.

hearing to the putative class members, the parties retained the services of Rust Consulting, Inc.  On August 28, 2009, Rust Consulting disseminated copies of the Court-approved class notice to the last known addresses of the class members via first-class, postage prepaid mail.  Id. at 229; 232-33.  A total of 13,265 Pennsylvania residents received notices in their capacity as putative class members; only 32 submitted a request for exclusion from the class.  Lake Decl. ¶ 9-11, attached to Def. Mot. to Enforce (Docket No. 547-3, at 3-4).

Multiple times throughout the class notice, class members were informed that if they did not exclude themselves from the class, they could not later bring suit against the defendants. For example, the notice stated that "Unless you properly exclude yourself, you are staying in the Class, and that means: (1) that you can't sue, continue to sue, or be part of or receive any benefits in or from any other lawsuit, arbitration, administrative or regulatory proceeding, order, or other legal proceeding anywhere against the Defendants . . . ."  In re Am. Investors, 2011 WL 6046737, at *2 (Dec. 6, 2011).

Among those who were noticed through this process are the thirty-six individuals, including the two named plaintiffs, who are the focus of the instant motion.  Rust Consulting did not

6

receive any notification from the Postal Service indicating that the mail was not delivered to those thirty-six individuals. Indeed, none of the thirty-six individuals opted out of the settlement.  Lake Decl. ¶ 13-15.

C.   Fairness Hearing

On November 6, 2009, the Court held a fairness hearing on the proposed class settlement, at which counsel for plaintiffs and defendants spoke on behalf of their clients.  No class members appeared at the hearing.  In re Am. Investors, 263 F.R.D. at 233-34.

Two state government entities participated in the fairness hearing process, including counsel for the Pennsylvania Attorney General's Office, who submitted an amicus brief in advance of the hearing and appeared at the actual hearing.  Id. at 234, 241.  The amicus brief objected to the settlement to the extent that it included within its Releasees the "agents" of the named Defendants; it was concerned that the term "agents" may be interpreted too broadly.  It also objected to the extent that the settlement "would impede or impair the Commonwealth's statutory right to seek relief on behalf of affected consumers or otherwise limit class members or Plaintiffs, or any other

7

consumer for that matter, from 'participating' in the ongoing litigation, including, without limitation, by witness testimony." Docket No. 436, at 7-8. It stated, "[t]he Commonwealth must be free to vindicate the public interest by all means necessary in the ongoing litigation and to be assured that no future arguments will be made, based on the terms of this release, which would impact its litigation in an adverse way." Id. at 8.

After the hearing, the Court certified the class and approved the settlement, holding that the class and settlement met the requirements of Fed. R. Civ. P. 23(3) and the United States Constitution. 263 F.R.D. at 243. Incorporating language from the stipulation of settlement into its final order and judgment, the Court entered a permanent injunction that barred class members from filing, prosecuting, and maintaining a lawsuit that was based on or related to the same causes of action. Id. at 250-51.

As to the objections of the Pennsylvania Attorney General, the parties worked together to amend the release language to permit class members to cooperate with pending regulatory investigations. Id. at 242. As a result, the order stated that "[n]othing in this Order shall be construed to

8

impede, impinge, impair, or prevent in any fashion any Named Plaintiff and/or Class Member from responding to, cooperating in or communicating with any state, federal or local government body or official or any attorney representing a private party, including, without limitation, appearance as a witness for testimony or the production of information." Id. at 251.

However, the Court reserved judgment as to whether any claims brought by regulators to enforce their own law enforcement powers would be barred by the settlement. Id. at 234. It held that "[t]he defendants in this action are entitled to a release of all claims held by class members in exchange for providing the relief outlined in the settlement. The attorneys' general law enforcement powers are not claims the plaintiffs have, and as such, the plaintiffs do not release any of these claims." Id. at 241.

Finally, the Court's order retained jurisdiction as to all matters relating to the administration, consummation, enforcement and interpretation of the stipulation of settlement and final order and judgment. Id. at 251.

D.   <u>Pennsylvania Attorney General's Civil Enforcement</u>
     <u>Proceeding</u>

In addition to the instant case, the Aviva defendants have also been involved in a pending state civil enforcement action initiated by the Pennsylvania Attorney General.  This lawsuit, which was filed in the Commonwealth Court of Pennsylvania, is captioned <u>Commonwealth of Pennsylvania v. Estate Planning Advisors Corp., et al.</u>, 740 M.D. 2004 ("Attorney General Lawsuit").

The Attorney General Lawsuit was filed on or about October 2004.  In total, its amended complaint consists of seven counts against sixteen defendants.  It alleges that the defendants, who were in the business of "promoting and selling estate planning services and products," utilized improper marketing techniques in targeting senior citizens to buy their products.  Attorney General Lawsuit Am. Compl., attached to Def. Mot., Herman Decl., exh. 1 (Docket No. 547-6).

The claims against the Aviva defendants focus on the impropriety of the marketing and sale of Aviva deferred annuities.  The Attorney General has asserted that the Aviva defendants violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count III) and the Charities Act and

10

Judicial Code (Count VII).  Specifically, the complaint alleged
that the Aviva defendants improperly advised consumers regarding
revocable living trusts and other estate planning strategies
under the pretense of being "Certified Senior Advisors" or other
"expert" estate planners.  Id. at 20.  It also alleged that the
defendants' representatives improperly used "misrepresentations,
omissions and scare tactics . . . with respect to the sale of
annuity contracts and Qualified Charitable Gift Annuity
Contracts sold to Pennsylvania consumers."  Id. at 35.

        The state trial court's scheduling order set discovery to
be completed by April 8, 2013.  As part of discovery production,
the Aviva defendants received from the Commonwealth two letter
templates, dated March 8 and March 25, 2013, which had been
utilized by the Attorney General to prepare letters to be mailed
to individuals in Pennsylvania with whom the Office had contact
in the course of its investigation and subsequent trial
preparation.  The letters informed its recipients that in
addition to civil penalties and injunctive relief, the Attorney
General was also seeking "restitution in our lawsuit on behalf
of affected consumers, as authorized by the Consumer Protection
Law."  If the recipients wished to submit a claim for
restitution in the Attorney General Lawsuit, the letter

instructed them to complete and return an enclosed "Affidavit and Restitution Claim Form" ("Claim Form").  Herman Decl., exh. C (Docket No. 547-8).

The enclosed Claim Form asked for basic identifying information of the potential claimants.  It also asked whether they purchased living trusts or annuities and its cost. Finally, it asked claimants to "verify" that they had not "received credit, reimbursement, or refund of the above amounts in any form."  This statement was made "subject to the penalties of 18 Pa. Cons. Stat. § 4904.  Id., exh. F (Docket No. 547-11).

The defendants eventually became aware that thirty-six policy owners of American Investors Life Insurance Company or AmerUs Life Insurance Company annuities, or persons acting on behalf of those owners, returned signed Claim Forms expressing a claim for restitution.  Herman Decl. ¶ 12-13; see, e.g., id., exh. F.  These restitution claimants are named plaintiffs or class members of the instant case and settlement.  Each had been sent a stipulation of settlement and class notice by Rust Consulting, and none had asked to be excluded from the class. Lake Decl. ¶ 13.

Upon learning of the claims for restitution by settlement class members, the Aviva defendants filed the instant motion and

a supplemental, related motion in front of this Court.  It sought an order enjoining subject class members, and all persons acting or purporting to act on their behalf, from seeking or receiving restitution or monetary relief from the Aviva Defendants in connection with the Attorney General Lawsuit.[5] Although no class members opposed the motion, the Attorney General filed a brief in opposition on May 17, 2013 and requested that the Court hear oral argument on the motion.  The Court held oral argument on June 20, 2013.


II.   Analysis

        District courts are authorized under the All Writs Act to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and

---

[5] The Aviva defendants' original motion had identified thirty-four "subject class members" who were American Investors Life Insurance Company or AmerUs Life Insurance Company annuity policy owners and had returned signed Claim Forms to the Attorney General's Office.  Herman Decl. ¶ 12.  Their subsequently-submitted motion for leave to file an additional declaration added two other individuals, increasing the total to thirty-six.  Supp. Herman Decl., exh. 1, at 3 (Docket No. 555-1, at 3-4).  Their proposed order is not limited only to those thirty-six class members, but also includes "any other plaintiffs or settlement class members who apply to receive additional restitution" in the Attorney General Lawsuit.  Id., exh. 2, at 1.

principles of law." 28 U.S.C. § 1651.  In the context of state court proceedings, district courts are limited by the Anti-Injunction Act, which states that federal courts may only grant injunctions to stay state court proceedings under three circumstances:  1) with Congressional authorization; 2) when the injunction is needed to aid the district court's jurisdiction; and 3) when the injunction is needed to protect or effectuate its judgments.  28 U.S.C. § 2283.

The Third Circuit has held that a district court may enjoin state court proceedings to protect its jurisdiction when it is "entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts." In re Diet Drugs Prod. Liab. Litig., 369 F.3d 293, 306 (3d Cir. 2004) (internal citations omitted); see also In re Prudential Ins. Co. of Am. Sales Practices Litig., 314 F.3d 99, 104-05 (3d Cir. 2002) (stating that district courts overseeing complex federal litigation "are especially susceptible to disruption by related actions in state fora.").

Here, the Court has authority to grant the instant motion in order to aid in its jurisdiction.  In its final order, the Court retained its jurisdiction "as to all matters relating to

14

the administration, consummation, enforcement and interpretation
of the Settlement Stipulation and of this Final Order and
Judgment." 263 F.R.D. at 251. The class members' claims for
restitution are related to events covered by the settlement's
release and waiver, and as such, the instant motion is related
to the enforcement and interpretation of the settlement. See
also In re Am. Investors, 2011 WL 6046737, at *4-5 (Dec. 6,
2011) (finding jurisdiction to grant motion to enforce against a
class member who had instituted a Florida state court action).

        The instant case is a complex litigation that involves a
consolidation of cases from multiple districts. The parties
have spent years navigating the substantial interests involved,
and the Court has expended significant effort in overseeing the
settlement process. If a state court were to now issue
additional damages for certain class members covered by the
settlement's terms, such a holding would disrupt this Court's
jurisdiction over the administration of the settlement, and
would impair the federal court's flexibility and authority to
interpret its order and judgment. In re Diet Drugs, 369 F.3d at
306; see also In re Prudential, 314 F.3d at 105 ("Permitting
continued litigation of these claims would 'unsettle' what had

15

been thought to be settled, and would disrupt carefully constructed procedures for individual dispute resolution.").

It is clear that the class members' restitution claims in the Attorney General Lawsuit are based on transactions that were covered in the terms of the federal settlement.  The Attorney General's complaint alleges that the Aviva defendants violated certain state laws in their marketing, solicitation, and sales of Aviva deferred annuities.  This falls squarely within the scope of the settlement, under which class members discharged defendants from "any and all causes of action," whether such causes of action "are based on federal, state, or local law, statute, ordinance, or regulation," "relating to any Company Annuities and that were or could have been asserted against Defendants," or "relating in any way to the Released Transactions."  In re Am. Investors, 236 F.R.D. at 248-49.

The class members were properly advised of the consequences of remaining in the settlement class.[6]  See In re

_____

[6] The Court has previously held that the class notice constituted the best practicable notice under the circumstances; was reasonably calculated to apprise settlement class members of their rights and the binding effect of the orders and judgment in this action; complied with Fed. R. Civ. P. 23(e); and satisfied the requirements under the United States Constitution and other applicable laws.  236 F.R.D. at 246-47.  The Attorney

<u>Am. Investors</u>, 2011 WL 6046737, at *2 (settlement notice informed class members that "Unless you properly exclude yourself, you are staying in the Class, and that means: (1) that you can't sue, continue to sue, or be part of or receive any benefits in or from any other lawsuit . . . ."). They were given an opportunity to contest its terms at the fairness hearing, and they did not choose to object. In addition, the Claim Form distributed by the Attorney General required that claimants verify that they had not "received credit, reimbursement or refund of the above amounts in any form," a second reminder to restitution claimants that such obligations existed. Herman Decl., exh. F.

Under these facts, if the class members were to receive restitution from the Attorney General proceeding, such receipt would violate the terms of the federal settlement. The Court thus has jurisdiction under the All Writs Act to prevent this from occurring.

In its opposition, the Attorney General acknowledged that its state law claims against the Aviva defendants have the same nucleus of facts as those involved in the federal case and

---

General has not questioned the propriety of the class notice. Tr. Hr'g 6/20/13 40:13-41:6.

subsequent settlement.  However, it disputed that the two
proceedings are parallel, and that the restitution at issue
should be enjoined, because it argued that the state court case
was undertaken by the government, not by a private actor.

Specifically, the Attorney General argued that it
initiated the state court lawsuit on behalf of the public and in
order "to protect the citizenry."  Opp. at 4.  Its argument is
premised upon its powers under the Unfair Trade Practices and
Consumer Protection Law, 73 P.S. § 201-1, et seq. ("Consumer
Protection Law").  Under 73 P.S. § 201-4, the Attorney General
is vested with the authority to bring an action "in the public
interest" against any person engaging in practices declared
unlawful by the Consumer Protection Law, and it may seek three
types of remedies:  injunctive relief, civil penalties, and
restitution.  73 P.S. § 201-4.1, 201-8(b); see also Commonwealth
v. Ted Sopko Auto Sales and Locator, 719 A.2d 1111, 1114 (Pa.
Commw. Ct. 1988).  According to the Attorney General, because
the restitution is sought by the Commonwealth in accordance with
its stated powers under the Consumer Protection Law, and because
the Commonwealth was not a member of the settlement class, such
relief was not – and could not have been – released by the
federal settlement.  E.g., Commodity Futures Trading Comm'n v.

18

Commercial Hedge Servs., Inc., 422 F. Supp. 2d 1057, 1060 (D. Neb. 2006) (refusing to enjoin federal administrative agency from seeking restitution for settlement class members because the agency is seeking to protect the public interest and is not bound by private agreements).

The Court agrees that, in general, there is a difference in a settlement's preclusive effect on a lawsuit initiated by a private party and a lawsuit initiated by a government agency. However, the Court is guided by Supreme Court and Third Circuit precedent in holding that this difference is not dispositive here.

In EEOC v. Waffle House, Inc., the Supreme Court considered whether a mandatory arbitration clause in a former employee's employment contract barred the EEOC from pursuing victim-specific judicial relief on behalf of the employee.  The Court held that, in light of the detailed enforcement scheme contemplated by Congress in enacting the ADA, such relief was available to the EEOC.  534 U.S. 279, 296 (2002).  However, it also held that certain conduct of the former employee "may have the effect of limiting the relief that the EEOC may obtain in court."  Id.  As an example, it referred to a situation in which the employee had accepted a monetary settlement from the

defendant.  In that case, "any recovery by the EEOC would be limited accordingly," because "it goes without saying that the courts can and should preclude double recovery by an individual."  Id. at 296-97 (internal citations omitted).

     The Waffle House Court's previous-settlement example was actually a reference to the facts and holding of a Third Circuit case, EEOC v. U.S. Steel Corp., which the Court cited with approval.  In U.S. Steel, the EEOC filed an age discrimination action against the defendants, seeking, among other remedies, individual retroactive relief for all qualified former employees.  921 F.2d 489, 495 (3d Cir. 1990).  The EEOC's action resulted in a judgment against the defendants.  Id. at 491. Prior to the initiation of the EEOC case, however, a number of employees had filed their own lawsuits, some of which had settled and some of which lost at trial.  The question before the Third Circuit was whether res judicata barred the award of individual relief for the former employees who had previously litigated their ADEA claim and suffered an adverse final judgment.[7]  Id. at 491-92.

_____

[7] The Third Circuit did not consider whether those individuals who had settled their discrimination claims could seek additional relief because the EEOC seemed to have conceded that matter.  However, it noted that "[o]ther circuits have held that

The Third Circuit held that, under the ADEA's enforcement scheme, claim preclusion applied because the EEOC was in privity with the private plaintiffs.[8]  In making this conclusion, the court rejected the EEOC's argument that it was protecting a broader independent public interest "different from that of an individual grievant."  Id. at 496.  The court noted the "accurate and important" role of the EEOC in protecting the public interest, and it acknowledged the delicacy of determining whether government agencies are representing private individuals.  However, it distinguished between the EEOC's role in protecting the public interest and its role in vindicating specific private claims.  "When the Commission seeks individualized benefits under the ADEA for particular grievants, as it did in this case, the Commission functions to that extent as their representative, and the doctrine of representative claim preclusion applies."  Id.  Thus, it held that individuals who fully litigated their own claims under the ADEA are claim

---

an individual who settles a discrimination claim may not obtain additional relief in an EEOC action asserting the same claim."  See id. at 492, n.3 (citing cases).

[8] Although U.S. Steel is not binding on this case, in that it focuses on the particular enforcement scheme of the ADEA, the Third Circuit's analysis with regard to the EEOC's "public interest" argument gives the Court guidance in addressing the Attorney General's similar contentions.

precluded from obtaining individual relief in a subsequent EEOC action based on those claims.  Id. at 496-97.

Similar concerns are triggered here.  Under the Consumer Protection Law, a court "may in its discretion direct that the defendant or defendants restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any violation of this act."  73 P.S. § 201-4.1 (emphasis added).  The law is clear – and the parties agree – that the money ultimately belongs to the claimant individuals, not the government.  Thus, even though the restitution is sought by (and arguably in the name of) the Attorney General, it does so "on behalf of affected consumers" who are also class members, raising res judicata concerns as discussed in U.S. Steel.  See Herman Decl., exh. C.

Moreover, at oral argument, counsel for the Attorney General reserved its right to seek restitution equaling the total amount of the class members' annuity losses.  Tr. Hr'g 6/20/13 29:6-30:25.  Because the class members have already received certain sums in settlement, restitution above that sum

22

could very well result in double recovery in violation of the
Supreme Court's holding in <u>Waffle House</u>.[9]

It is important to recognize that the Attorney General
still has at its disposal several other forms of remedies that
it may pursue through the course of the trial and afterward.
Indeed, under the Consumer Protection Law, the Attorney General
may still seek injunctions and civil penalties against the
defendants.  73 P.S. § 201-4, 201-8(b).  This is markedly
different from the posture of <u>Spinelli v. Capital One Bank</u>, in
which defendants sought to enjoin the attorney generals from
prosecuting their cases completely.  No. 08-132, 2012 WL
3609028, at *1 (M.D. Fl. Aug. 22, 2012).  Thus, although the

_____

[9] The Attorney General argues that an injunction is premature at
this point because the Commonwealth Court can, at a later date,
award amounts of restitution that satisfy the <u>Waffle House</u>
reasoning; put another way, it is up to the second court, not
this one, to fashion an equitable remedy that does not result in
double recovery.  Where, as here, the class settlement is
complicated and difficult to quantify, the Attorney General's
proposed solution is impracticable.  The Court sees no reason to
put upon the Commonwealth Court the task of somehow calculating
a cap on restitution that protects against double recovery,
especially when the calculation is primarily based upon a
settlement that is within the purview and jurisdiction of this
Court.  In addition, insofar as the Attorney General has
indicated that it will seek as restitution the full amount of
the loss (and not the difference between the full amount and the
amount awarded in settlement), its recommendations will likely
offer little guidance in making this calculation.

remedies provided to the Attorney General under the Consumer Protection Law are constrained by the Court's holding, they are not completely precluded, and certainly not beyond that anticipated by the U.S. Steel court.

The Court must weigh the Attorney General's interests against the multiple other interests at stake, most importantly those of the parties to the settlement.  The settlement was the product of years of complex negotiation by the parties.  It was the subject of careful scrutiny by the Court.  The class members were given many opportunities to voice their objections or otherwise be excluded from the class, but they chose not to do so.  As such, the terms of the settlement, as it was proposed and assessed back in 2009, is exactly what they bargained for.

The Court will not allow the class members, or the Attorney General acting on their behalf, to demand more money from the defendants at this juncture.  These claims for restitution are in effect post-negotiation "collateral attacks" on the settlement, and, given the thousands of potential class members who could have submitted a claim, the potential for disruption to the settlement is great.  Indeed, if the Court were to allow such claims to go forth, the defendants would no doubt be reluctant to enter into settlement agreements in the

24

first instance.  In the words of the Third Circuit, "[a]llowing comprehensive settlements to be undermined in this way would undeniably deter similar settlements in the future."  In re Prudential, 314 F.3d at 105.  To permit such claims not only overwhelms the instant settlement, but would likely have a chilling effect on future settlement negotiations, as well.

Thus, the Court is persuaded that the potential for disruption to the terms of the settlement overrides the Attorney General's need to pursue a third type of remedy in its state court proceeding.  The Court will exercise its jurisdiction under the All Writs Act and grant the injunction requested by the Aviva defendants.

An appropriate order shall issue separately.

25